## Case No. 7,143.

### JACKSON v. PORTER.

[1 Paine, 457.] [1]

Circuit Court, N. D. New York. Sept. Term, 1825.

[1] [Reported by Elijah Paine, Jr., Esq.]

Samuel M. Hopkins and R. Beach, for plaintiff,

S. Jones and S. A. Talcott, for defendant.

THOMPSON, Circuit Justice. This case comes up on a writ of error to the district court of the Northern district of this state. And the errors complained of arise upon a bill of exceptions taken to the opinion of the court, ordering the plaintiff to be nonsuited. The range of argument taken at the bar, has led to the discussion of some questions which, according to my view of the case, do not necessarily arise, and which in the course of this opinion will be only cursorily noticed. The right or title upon which the lessors of the plaintiff rely is derived from John Stedman. And if he had any estate which could descend to his heirs. it is not to be denied but that Susannah Sparkman is entitled to it. The first inquiry then which seems naturally to arise is, what was the interest of John Stedman in the premises in question? The bill of exceptions is extremely lame and uncertain as to the location of the premises in question. It is, however, very certain, that the defendant is in possession of some land, embraced within the claim of John Stedman, and if that claim has been established as a legal, valid, and subsisting right, the plaintiff was entitled to a verdict, and was improperly nonsuited.

The claim of Stedman covered about five thousand acres of land, comprised within the following bounds: Beginning at a place called Devil's Hole. some distance below the Falls of Niagara, and running from thence to Gill creek, then down the creek to the Niagara river, then down the river to the place of beginning. It is not very satisfactorily ascertained when Stedman went into possession of any part of the land comprised within his claim. One of the witnesses (Humphrey) says, that he was there in the year 1769, had a house, stores, and stables, and about thirty or forty acres of land improved. But he did not at this time claim the whole tract above-mentioned, nor did that possession and improvement extend to any part of the land now occupied by the defendant. This possession was near Fort Schlosser, and Stedman was there having the charge of, and contract for the portage both of the king's stores and private property, from Fort Schlosser to the place where Lewiston is now situated. There is no evidence that at this time Stedman claimed any title to the land. He had a mere naked possession; and the

ground on which he afterwards rested his claim, shows that he could not then have pretended to claim any title. The testimony, as to the actual possession of John Stedman, is extremely loose and unsatisfactory. It is however, pretty evident, that most of his improvements were upon what is now called, (and laid down upon the diagram accompanying the bill of exceptions,) the Stedman farm, containing five hundred and eighty-one acres; and which is now in the possession of Ware, as the tenant of the lessor of the plaintiff. The house which Stedman built in the year 1771, was upon this farm, about one hundred and fifty yards below Fort Schlosser, and about one mile from the falls where the defendant lives. In 1772 the improvements were small, only about one hundred acres cleared; which clearings were from time to time enlarged, but how far they touched the land now occupied by the defendant, is left very much in doubt.

It is unnecessary however to pursue this inquiry; for if the right to recover was placed upon possession alone, the nature and extent of that possession, and whether adverse or not, ought to have been submitted to the jury. But John Stedman did not put his claim upon possession, but upon title derived from the Indians. Possession accompanied with a claim of ownership in fee, may be deemed prima facie evidence of such an estate. In such case it is not the possession alone, but that it is accompanied with the claim of the fee, which gives this effect by construction of law to the acts of the party. Possession per se is evidence of no more than the mere fact of present occupation by right. Hence the declarations of a party in possession are always admitted to show the extent and nature of the interest he claimed in the land; and from the very nature of the case, it must depend on these collateral circumstances to ascertain the extent of his interest. If the occupant of land avows his interest to be that of a term of years, it would be absurd to consider his possession evidence of a fee; and it is certainly granting all that can reasonably be asked, to allow the occupant an interest as large as he claimed; and it cannot be permitted to him to abandon such claim and set up a different interest, unless he can show his title, and that he was under some mistake of law in relation to it. These are rules founded on the plainest principles of reason and justice, and fully recognised by the supreme court of the United States in the case of Ricard v. Williams, 7 Wheat. [20 U. S.] 105. The interest of John Stedman, therefore, to the land in question, must be tried by, and limited to that which he declared it to be. And the testimony upon that point is from the plaintiff's witnesses alone. and is full and conclusive to show, that the claim in its broadest extent was no more than the Indian title, confirmed by Sir William Johnson. And the answer of the witnesses on this point did

not fall from them casually, and without being expressly called for. It was made a question by direct application to the court, whether it was competent to inquire into the declarations of Stedman as to his claim of title. And it is fair to presume the inquiry was as broad as the fact would warrant, or the answer expected. The bill of exceptions states that the counsel for the plaintiff proposed to inquire of the witness, Prout, whether or not John Stedman, while in possession, claimed to hold the land by virtue of a deed from the Indians, confirmed by Sir William Johnson as superintendent of Indian affairs. This was objected to unless the deed was produced. The objection was overruled; and the witness stated, that he had many times heard Stedman claim the lands to be his by virtue of a deed from the Indians, confirmed as aforesaid—that it was given to him by the Indians, by way of compensation for the damages they had done him in the year 1763—that Stedman had no other title as the witness knew of, and that he had heard Stedman say he had not. Here then is a disclosure, not only affirmatively what Stedman did claim, but an express negation of any other title. And all the other witnesses who speak of Stedman's declarations respecting his title, either expressly or by necessary implication, refer to the Indian deed. We may therefore safely conclude, that Stedman neither had nor pretended to have any other title. This deed is claimed to have been given by the Seneca Indians, and confirmed by Sir William Johnson some time in the year 1764. This deed was not produced upon the trial; and it was made one of the principal objections to the nonsuit, that it ought to have been submitted to the jury to presume the existence of the deed.

Many cases were cited and much time taken up, in the discussion of the rules and principles which govern the doctrine of presumption of grants and deeds. On the one side it was contended, that this was a question exclusively for the jury, and that the court below erred in taking it from them. On the other side it was very strenuously urged, that this presumption was an inference of law and for the court to decide. I do not deem it necessary to enter at large into an examination of this point, or to express any decided opinion upon it. I have looked into most of the cases cited, and they certainly afford some colour for the argument on both sides. And the correct view of the subject, perhaps, is to consider it a mixed question of law and fact; and in most, if not in all cases, to be submitted to the jury under the advice of the court. The law has not defined any precise circumstances, or fixed the time, which shall necessarily raise the presumption of a deed or grant. In general, it is the policy of the law to limit this presumption to periods analogous to those of the statute of limitations. But this is not an invariable rule. Presumptions of this nature are adopted from the general infirmity of human nature; the difficulty of preserving manuscripts of title, and the public policy of supporting long and uninterrupted possessions; and are founded upon the consideration, that the facts and circumstances are such as could not, according to the ordinary course of human affairs, occur, without presuming a transfer of title, or an admission of an existing adverse title in the party in possession. When the title deeds are not produced, their existence is the fact to be established; and the circumstances from which this is to be inferred, would seem to me very clearly to be matter for the consideration of a jury. They may be rebutted by contrary presumptions. And the existence of such title deeds can never be fairly presumed, when all the circumstances are perfectly consistent with the non-existence of such deeds. If it was now to be made a question, whether John Stedman had once an Indian deed, confirmed by Sir William Johnson, I should think it a question which ought to be submitted to a jury. But if the existence of the deed is admitted, the legal effect and operation of such deed is a question of law for the court. And even admitting that the court below erred in taking this question from the jury, it would be useless to send the cause to another trial on this ground, if the existence of such a deed would not vary the rights of the lessors of the plaintiff. I shall therefore assume, that John Stedman had an Indian deed, confirmed by Sir William Johnson, according to his claim, and give to it the same force and effect as if produced upon the trial.

A question here arises, whether, from the evidence as it stood when the nonsuit was granted, the jury would have been authorized to enter into the inquiry, and presume the existence of any other title than that which was claimed by John Stedman; and I think they would not. This principle is fully recognised in the case already referred to of Ricard v. Williams, and is certainly allowing to the occupant of land all that he could reasonably ask; unless he could show some other title, and make it appear he was under some mistake as to the claim he had set up. The title which John Stedman uniformly claimed was that derived from the Indian deed confirmed by Sir William Johnson, and a disclaimer of having any other title. Under such circumstances, and in the absence of all proof to support any other claim of title, with what pretence could the jury be called upon to presume a grant from the crown, or a title from any other quarter? Had the possession of Stedman been accompanied by a claim of title generally, without designating what, the question would then have been at large, and open to the presumption of any title consistent with the facts and circumstances in evidence. But when the possessor of land discloses what interest he claims in it, and his title being evidenced

only by his possession and claim, it must be limited to that which he has asserted. Cases have been referred to containing very strong expressions of judges, how far courts and juries should go in presuming grants and deeds, to protect and quiet long and uninterrupted possessions. But it will be found in those cases, that the possession was accompanied by a claim of title generally, and not the designation of any particular interest. A jury could not certainly be called upon to presume more than the party claimed. If the claim was simply an estate for life or years, no judge I presume would tell a jury they were at liberty to presume an estate in fee simple.

The next question that seems naturally to arise, is, the legal effect and operation of an Indian deed, and in what light such conveyances are viewed in courts of justice. This subject has recently received a very full examination of the supreme court of the United States in the case of Johnson v. M'Intosh, 8 Wheat. [21 U. S.] 571. The point of inquiry there was simply. as to the power of the Indians to give, and of private individuals to receive, a title, which could be sustained by the court. There were no objections to the grants themselves, or that the Indians were not in the rightful possession of the land they undertook to sell. So that the broad inquiry was, their right to sell, and of the grantee to purchase. The chief justice, in delivering the opinion of the court, went into a very particular examination of the principles and policy which had governed all the European nations which had made discoveries and settlements in this country, touching the rights of the natives. The title of the government to the country was placed on the ground of discovery, which title was to be consummated by possession, and which gave to the government the exclusive right of acquiring the soil from the natives, and of regulating the relations that were to exist between such government and the natives. The Indians were considered as being the rightful occupants of the soil, with a legal as well as just claim to retain possession of it. and to use it according to their own discretion. But their rights to complete sovereignty as independent nations, were necessarily diminished. And their power to dispose of the soil at their own will to whomsoever they pleased, was denied. The European nations, by whose subjects the discoveries were made, respected the rights of the natives as occupants, but asserted the ultimate dominion to be in themselves; and as a necessary consequence thereof, claimed and exercised the power of granting the soil while yet in the possession of the Indians. And such grants have been universally understood to convey a title to the grantees, subject only to the Indian right of occupancy. The United States have adopted and acted upon the same principles. By the revolution, the power of government and right of soil which had

been previously in Great Britain, passed definitively to these states. And it has never been doubted but that either the United States or the several states had a clear title to all the lands within the boundary lines described in the treaty of peace, subject only to the Indian right of occupancy; and that the exclusive power to extinguish that right was vested in that government, which might constitutionally exercise it. And the practical assertion of this right is seen in the policy which has governed the United States and the individual states, in prohibiting all purchases of the Indians by individuals in their own right. And the Indians being mere occupants, are deemed incapable of transferring an absolute title to others. This occupancy is not incompatible with a seisin in fee in the state. A purchaser, from the natives, at all events, could acquire only the Indian title, and must hold under them and according to their laws. The grant must derive its efficacy from their will, and if they choose to resume it and make a different disposition of it, courts cannot protect the right before granted. The purchaser incorporates himself with the Indians, and the purchase is to be considered in the same light as if the grant had been made to an Indian; and might be resumed by the tribe, and granted over again at their pleasure.

If this be the view which we are to take of the Indian right of occupancy, the claim of John Stedman considered in the most favourable manner, could never have been any thing more than a mere right of possession, subject to be reclaimed, and extinguished at the will of the Indians, and which has been done, as will be seen hereafter. But it may very well be questioned, whether this claim is entitled even to so favourable a consideration. As the claim of Stedman rests upon an Indian deed, confirmed by Sir William Johnson, it may be proper to inquire into the power of Sir William Johnson on this subject, in order to ascertain what is to be understood by his confirmation. The deed is not before us. and as the cause was taken from the jury, it must now be admitted, that it was unexceptionable in point of form. And as Stedman disclaimed having any other title than that which was derived from the Indian deed, and Sir William Johnson's confirmation, unless he had authority to pass the title, none could have been vested in Stedman. The pretended confirmation of Sir William Johnson is as follows: "Fort Niagara, September 20th, 1763. I William Johnson, commander-in-chief of the army, at and about Fort Niagara, and superintendent of Indian affairs, do certify and approve the within deed, given by the chiefs and warriors of the Seneca Nation of Indians to John Stedman." There must be some mistake with respect to dates. The deed is said to have been given in the year 1764. and the confirmation, as it is called, bears date the preceding year. But the en-

dorsement does not purport to be any thing more than a certificate, approving of the purchase; and does not profess to be an act which shall complete, or transfer any title: and if Sir William Johnson had no such power, a construction ought not to be given to his acts, which involves a violation of his duty. Let us then briefly inquire what were his powers in this respect. Sir John Johnson in his testimony says, that from the year 1755, to the year 1774, Sir William held the offices of superintendent of Indian affairs, and colonel of the Six United Nations of Indians, and was one of the council of the governor of the colony of New-York. That his duty as superintendent of Indian affairs, required him to hold treaties with the Six Nations of Indians, and all the Indians of the Northern district, and to superintend all purchases of land, from them or either of them. Here is certainly no power to transfer any title. A grant from the crown, or from the colonial governor, was necessary for this purpose. But whatever authority Sir William Johnson might have had in this respect previous to the year 1762, it must have ceased after that time. Early in that year (according to the testimony of Sir John Johnson,) he received from the lieut. governor of the province of New-York, instructions in relation to the purchase of land from the Indians, a copy of which is given as one of the exhibits in the cause. There is a mistake in the reference; but the identity of the document was admitted on the argument, and this was the plaintiff's evidence, and no objection taken to its admissibility. They purported to be additional instructions, and although addressed to the governor of the province, must have been sent to the superintendent of Indian affairs, to regulate and govern his conduct. These instructions were directed to be made public by proclamation, which was accordingly issued by Lieut. Governor Colden, in February, 1762, in which the instructions were set out at large. This was offered on the part of the defendant, and objected to, but admitted to be read to the court, on the argument of the motion for a nonsuit. It is not very important to inquire into the regularity of this course, for the proclamation contains nothing more than the instructions at large, the material parts of which had been given in evidence on the part of the plaintiff; and are substantially reiterated in the proclamation of the king, of the 7th of October, 1763; which has been published under the sanction and authority of the United States. 1 [Bior. & D.] Laws, 443.

These instructions and proclamations, recite the evils and abuses that had arisen, by reason of purchases made of the Indians, and the passing of grants by the colonial governors; and strictly enjoins and commands the governor, lieut. governor, president of the council, or commander-in-chief of the province of New-York, upon any pretence whatever, and upon pain of forfeiting their office, not to pass any grant to any person whatever, of any land within, or adjacent to, the territories possessed or occupied by the Indians, or the property or possession of which has at any time been reserved to, or claimed by them: And also prohibiting the granting of any license to purchase land of the Indians, but to send all applications made for that purpose, home to the king, and forbidding any private person making any purchase of the Indians: But that if at any time they should be inclined to dispose of their land, the same should be purchased for the crown, at some public meeting of the Indians, to be held for that purpose by the governor, or commander-in-chief of the colony where the land shall lie: and requiring all persons who had wilfully or inadvertently seated themselves upon any lands, which had not been ceded to, or purchased by the crown, forthwith to remove therefrom. After these instructions were made known here, it is very evident that no power existed in this country, so to authorize and confirm any purchase from the Indians, as to transfer the title to the land. Nor could it be permitted, to ask a jury to presume any such attempt to transfer the title, when it would imply a breach of trust, and a violation of duty in the officer who should thus act. The pretended confirmation therefore of Sir William Johnson, cannot be considered any thing more than an approval of the application for the purchase, to be sent home for the sanction and ratification of the king; and coming within what is stated by Sir John Johnson as having been a part of his duty, to superintend purchases made of the Indians. The authority of the king to regulate and control purchases from the Indians within his colonies, was not questioned on the argument, and cannot be denied. Any purchase made by Stedman in violation of such regulations, must of course be void, and he could acquire no right whatever thereby; not even the Indian right of occupancy; and he must have been an intruder, by any entry made under such purchase.

But admitting him to have obtained a rightful possession under such purchase, it must be restricted to his actual occupation, and can be of no avail, at all events in this suit. His first possession was near Fort Schlosser, which is, according to the testimony, about one mile from the defendant's possession. And as late as the year 1771, according to the testimony of one of the witnesses, he had only cleared and improved about four acres; and long before his improvements extended to any of the land in possession of the defendant, the Indians had resumed their right of occupancy, and ceded it by treaty to the crown. That such is the light in which Stedman's possession is to be viewed, necessarily results from the well settled rule, that where a man enters into land, having title, his seisin is not bounded by his actual possessions, but is held to be co-ex-

tensive with his title. But where he enters without title, his seisin is confined to his possessions by metes and bounds.

It has already been shown, that admitting a purchaser from the Indians acquires their right of occupancy, the Indians may whenever they choose, resume it, and make a different disposition of the land, which in the present case has been done by the 3d article of a treaty between his Britannic majesty and the Seneca Nation of Indians, dated the 3d of April, 1764. By this article, they cede to his majesty and his successors for ever, in full right, the lands from the Fort Niagara, extending easterly along Lake Ontario about four miles, comprehending the Petit Marias or landing place, and running from thence southerly about fourteen miles to the creek above Fort Schlosser or Little Niagara, and down the same to the river or strait; thence down the river or strait, and across the same at the great cataract; thence northerly to the banks of Lake Ontario, at a creek or small lake about two miles west of the fort; thence easterly along the banks of Lake Ontario, and across the river or strait to Niagara, comprehending the whole carrying place, &c. That all the land embraced in Stedman's claim falls within these bounds, has not been questioned. This is one of the documents read by the defendant's counsel on the motion for a nonsuit. I do not however see from the bill of exceptions, that any objection was made to it. And it is recognised as a valid cession, and excepted out of a treaty made between the United States and the Six Nations of Indians, on the 11th of November, in the year 1794. 1 [Bior. & D.] Laws, 311 [7 Stat. 44]. There can therefore be no doubt, but that the Indian right to the land in question was ceded to the king by the treaty of 1764; and all Stedman's right of occupancy must then have ceased, and been extinguished; and he stood upon his mere naked possesssion, without title, and without the right of possession. According to the theory of the British constitution, the title to this land was at that time vested in the king; and Stedman, under the circumstances in which he was placed, could not be considered in any better light than a mere tenant at will. He did not pretend to have any grant from the crown, and must be deemed to have held in subordination to the right and title of the king. It could not be considered an adverse holding, and no length of possession would ripen it into a title.

But if he is to be considered as holding in hostility to the real owner, he must be held to strict proof of actual and continued possession, and must not have voluntarily abandoned it. The proof on this subject is extremely vague and unsatisfactory. Some of the witnesses do speak of improvements made in the year '90 or '92 along the river, above and below the falls, which must have embraced some of the land now occupied by the defendant; but the evidence does not warrant the conclusion that the possession was kept up. And most of the witnesses refer to improvements made on the farm of 582 acres, now in the possession of Ware, under the Stedman claim. And it ought to be borne in mind as explanatory of the acts of Stedman, that he was then under a contract for the portage, and which gave employment for a great number of horses and oxen, and many of his clearings and improvements were probably made for procuring subsistence for them. I do not mean however to enter into a critical examination of the testimony on the question of possession.

I think this was a subject which in strictness belonged to the jury, and I should have been better satisfied if it had been submitted to them. But as I do not think a verdict against the defendant on this ground could have been sustained, I am not inclined to reverse the judgment of nonsuit for this cause. The acts of Stedman are to be viewed with reference to the character and employment in which he was engaged. He was there before and during the revolution, in the enjoyment of an important and profitable trust under his contract for the portage. This was his original and primary object. He no doubt afterwards wished, and probably entertained hopes and expectations of obtaining a title for the land. But this only shows that he was there, not in hostility to the rightful owner, but under, and in subordination to the rights of the crown. And this view of Stedman's situation is very much strengthened by the consideration, that here was a military post, and an important portage, which it is very improbable the government would have disposed of. And besides, the Stedmans continued to hold this portage under contract with the government, until it was removed on the other side the Niagara river, about the year 1792. And according to the testimony of one of the witnesses, the contract for this portage was open to public competition once in every three years; which is utterly incompatible with the supposition, that Stedman could have claimed any exclusive right; and no exception was made by him in his claim, either of the military post or the portage. They stood on the same footing with the residue of the five thousand acres embraced within his claim. And Sir William Johnson, permitting Stedman to continue in possession, after the rigid instructions he had received in relation to Indian lands, can be accounted for on no other ground, than that he was there by permission of the government, under the contract for the portage, and not as claiming under an Indian purchase. And besides, his improvements, if at all extending beyond the limits of the farm now held by Ware, were very unimportant at the commencement of the revolution; and the extension of them during that period, or even down to the year 1796, when the post was surrendered by the

British government, cannot be construed into an acquiescence in any claim of right in Stedman.

It is said, however, that Ware, who was the tenant of Mrs. Sparkman, was forcibly dispossessed, and that the possession must be restored before the question of title can be inquired into. Admitting this to be a sound and salutary rule, it does not apply to the facts in this case. There is no evidence of any forcible dispossession of any of the land now in the occupation of the defendant. It was in proof on the part of the plaintiff, derived from the confessions of the defendant, that he and Barton had in the year 1805, obtained a patent from the state of New-York for some of the land, and which covered a part of Stedman's cleared fields; and that they had a lease under the authority of the state for the farm where Ware lived, but he would make no compromise with them, and that they had procured an act of the legislature to turn him off. The patent was not in evidence, and what land it covered does not appear. It is evident, however, that it did not cover the farm in possession of Ware, because Porter and Barton had only a lease for that from the state. There is no evidence that Porter exercised any acts of ownership over any part of this land, previous to the year 1805; and it is reasonable therefore to presume, in the absence of all proof to the contrary, that whatever possession he took out of the bounds of what is called the Stedman farm, was taken under the title derived from his patent. But it is objected, that this patent could pass no title by reason of the adverse possession held under the Stedman claim. This objection, however, is not tenable. In the first place, there is no evidence that there was any adverse possession, or any possession at all of the land covered by the patent. But admitting a possession in Ware under the Stedmans, of all the Indian right of occupancy, which is the utmost extent that could be claimed, it would form no objection to the operation of the patent. This point is fully settled by the case of Johnson v. McIntosh before referred to.

The only forcible dispossession of which there is any proof, is what was done by the sheriff, under the act of 1806. But this must at all events be confined to what is now called, and laid down on the diagram as the Stedman farm. The evidence on this subject is, that the sheriff went to the house occupied by Ware, he being from home, and removed his furniture from the house and piled it up about ten rods distant, and Mrs. Ware and her children went to a tavern across the road; and the defendant's workmen went immediately into the house, and in May or June of the same year, the defendant himself moved into the house. This act, admitting it to have been forcible, might in strictness be confined to the house only. But the defendant declared, that he and Barton had got a lease of the farm, and that the act of the legislature was procured to turn Ware off; which may be considered an admission that he was turned off the whole farm. But it shows at the same time, that the force, if construed to extend to the whole farm, must at all events be limited to that, and cannot in any manner affect the defendant's present possession. And Ware has regained the possession of this farm. It being left vacant during the late war, he re-entered, and still continues to occupy it. This state of facts supersedes the necessity of inquiring into the validity of the law, under which Ware was turned out of possession; or examining how far a party who gains possession by force, may in an action of ejectment protect himself by setting up a title to the land.

The only remaining inquiry is, whether the treaty of 1794,—1 [Bior. & D.] Laws, 206 [8 Stat. 116],—between the United States and Great Britain, will in any way aid the claim of the lessors of the plaintiff; and if the view which I have taken of this claim be correct, little doubt can exist on this question. The 2d and 9th articles have been referred to. The 2d article declares, "that all settlers and traders within the precincts, or jurisdiction of the said posts, shall continue to enjoy unmolested, all their property of every kind, and shall be protected therein. They shall be at full liberty to remain there, or to remove, with all or any part of their effects: and it shall also be free to them, to sell their lands, houses, or effects, or to retain the property thereof at their discretion." Although the meaning of the term "settler," as here used, is not very obvious, yet as the object of the article was to protect any interest that might have been acquired in property, it is perhaps reasonable to consider him a settler who had such interest in land, within the precincts or jurisdiction of the post. But another question arises, as to what are the limits or jurisdiction of the post at Fort Schlosser. It was suggested, but no authority cited to support the position, that it extended to the distance of three miles in every direction from the fort, in analogy to the rule of the law of nations, which gives to a country bordering on the sea coast, jurisdiction thereon to the extent of three miles. I cannot accede to this rule; but am inclined to think, it is to be proved as matter of fact, to what extent jurisdiction was exercised. There was no proof on that subject before the court.

But there is another and more conclusive reason for considering this article inapplicable to the case. It was obviously intended to protect some legal or equitable interest which the settler had acquired in land. And Stedman, as has already been shown, had no such interest which a court of law or equity could recognise, or which the British government was under any obligations to sanction and protect. The article never could have been intended to ratify and confirm

the possession of trespassers or intruders, who might be there without right. And the same remarks will apply to the 9th article, that secures to British subjects, who then held lands in the United States, the right of continuing to hold them, according to the nature and tenure of their estates, and titles therein, or to sell and dispose of the same at pleasure. But a mere naked or wrongful possession which the law would not protect, does not fall within the provisions of this article. The treaty applies to the title, whatever it is, and gives it the same legal validity as if the parties were citizens, and no more. The title however which it sanctions, is that which existed at the date of the treaty; and not any after acquired right, by length of possession or otherwise.

I am accordingly of opinion, that the judgment of the district court must be affirmed, and in this opinion the district judge concurs.