**Frank B. JAMES, et al., Plaintiffs, Appellants,**

v.

**James G. WATT, et al., Defendants, Appellees.**

**No. 83–1026.**

United States Court of Appeals, First Circuit.

Argued June 7, 1983.

Decided Aug. 24, 1983.

Robert C. Hahn, Boston, Mass., with whom William A. Hahn, Boston, Mass., and Hahn & Matkov were on brief, for plaintiffs, appellants.

Allan van Gestel, Boston, Mass., with whom Andrew S. Hogeland, and Goodwin, Procter & Hoar, Boston, Mass., were on brief, for defendants, appellees Christopher S. Look, Jr., as Sheriff of Dukes County, Beverly W. King, as Register of Deeds for Dukes County, and Alexander D. Forger, Trustee.

Thomas N. Tureen, with whom Tureen & Margolin, Portland, Me., was on brief, for defendant, appellee Wampanoag Tribe of Gay Head.

Thomas R. Kiley, Asst. Atty. Gen., Boston, Mass., with whom Francis X. Bellotti, Atty. Gen., and Paul R. Matthews, Asst. Atty. Gen., Boston, Mass., were on brief, for defendant, appellee Commonwealth of Mass.

Jacques B. Gelin, Attorney, Dept. of Justice, Washington, D.C., with whom Carol E. Dinkins, Asst. Atty. Gen., Washington, D.C., William F. Weld, U.S. Atty., Boston, Mass., and Anne S. Almy, Attorney, Dept. of Justice, Washington, D.C., were on brief, for defendant, appellee United States Secretary of Interior.

Before COFFIN and BREYER, Circuit Judges, and SELYA,* District Judge.

BREYER, *Circuit Judge.*

The plaintiffs in this case are individual Indians who claim an interest in land on Gay Head Peninsula, Martha's Vineyard, Massachusetts. In order to prevail, they must upset the present landowners' chain of title by showing that certain conveyances made many years ago by the Gay Head Indian tribe (or by individual Indians) are invalid. The district court granted summary judgment against the plaintiffs, from which they appeal. We find that the district court was correct.

## A

■ The plaintiffs' initial argument is based upon the Indian Nonintercourse Act (the INA)—a federal statute that provides:

No purchase, grant, lease, or other conveyance of lands, or of any title or claim thereto, from any Indian nation or tribe of Indians, shall be of any validity in law or equity, unless the same be made by treaty or convention entered into pursuant to the Constitution.

25 U.S.C. § 177. The plaintiffs argue that the relevant conveyances were not made pursuant to a "treaty or convention," that Massachusetts law could not authorize what the INA forbade, and that the conveyances are therefore invalid. The district court correctly rejected this argument, however, on the ground that the plaintiffs sued as individual Indians. The plaintiffs did not seek to represent the tribe, nor did they name the tribe as a plaintiff in the suit. We are not certain why they did not do so. But we know that the Gay Head Indian tribal government earlier filed a related suit by, and on behalf of, the Gay Head tribe; and we believe that plaintiff Indians here are dissidents who disapprove of the way that suit is being handled. This litigation strategy apparently played a role in the framing of their complaint.

Regardless, this court has held that the INA was designed to protect the land rights only of *tribes;* that the INA therefore granted a cause of action to tribes; and that individual Indians could not assert INA rights on their own behalf. *See Epps v. Andrus,* 611 F.2d 915, 917 (1st Cir.1979); *Mashpee Tribe v. New Seabury Corp.,* 592 F.2d 575, 581 (1st Cir.1979), *cert. denied,* 444 U.S. 866, 100 S.Ct. 138, 62 L.Ed.2d 90 (1979); *see also Mashpee Tribe v. Watt,* 542 F.Supp. 797, 803 (D.Mass.1982), *aff'd,* 707 F.2d 23 (1st Cir.1983); *Oneida Indian Nation v. County of Oneida,* 434 F.Supp. 527, 537 (N.D.N.Y.1977); *Narragansett Tribe of Indians v. Southern Rhode Island Land Development Corp.,* 418 F.Supp. 798, 803 (D.R. I.1976). In *Epps v. Andrus,* 611 F.2d at 917 (original in ital.), we explicitly stated that to invoke the INA a plaintiff "must show that ... it is or represents an Indian 'tribe' within the meaning of the Act...." That holding is *stare decisis* in this circuit, and we shall not reexamine it. Thus, plaintiffs' claim, insofar as it is based on the INA, must fail.

## B

■ The plaintiffs raised another argument below, which they now press strongly on appeal. They argue that the Indian Commerce Clause, U.S. Const. art. 1, § 8,

---

* Of the District of Rhode Island, sitting by designation.

automatically (in and of itself, without the INA) invalidated the Massachusetts statutes permitting the conveyances in question, *see* 1870 Mass.Acts ch. 213; 1869 Mass.Acts ch. 463; 1862 Mass.Acts ch. 184, and that the conveyances were therefore invalid. The Indian Commerce Clause grants to Congress the "Power ... To regulate Commerce ... with the Indian Tribes...." In the plaintiffs' view, this grant of power is exclusive, and took from Massachusetts *all* power to legislate in the area of Indian affairs.

Plaintiffs' proposed interpretation of the *Indian* Commerce Clause closely resembles James Madison's view of the *Interstate* Commerce Clause, U.S. Const. art. 1, § 8. Madison, believing it essential that states not be able to restrict trade among themselves, *The Federalist* No. 42 (J. Madison); 3 *The Records of the Federal Convention of 1787* at 478, 547–48 (M. Farrand ed. 1937), apparently thought that the mere existence of the Clause precluded state legislation regulating interstate commerce, regardless of whether Congress chose to exercise its own power to legislate. *See id.;* L. Tribe, *American Constitutional Law* § 6–3 (1978); Eule, *Laying the Dormant Commerce Clause to Rest*, 91 Yale L.J. 425, 431 (1982); *cf.* Tribe, *Toward A Syntax of the Unsaid: Construing the Sounds of Congressional and Constitutional Silence*, 57 Ind.L.J. 515, 521 (1982) [hereinafter cited as "Tribe, *Silence*"]. In *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 209, 6 L.Ed. 23 (1824), Chief Justice Marshall, following the Madisonian interpretation, suggested that the Clause not only grants Congress regulatory power over interstate commerce, but also "excludes, necessarily, the action of all others that would perform the same operation on the same thing." Soon after Chief Justice Marshall's tenure, however, the Supreme Court began to expand the area in which states were free to act. *See, e.g., The License Cases*, 46 U.S. (5 How.) 504, 573–74, 12 L.Ed. 256 (1847); L. Tribe, *American Constitutional Law* § 6–3. And, modern cases use a particularized analysis, weighing the strength of relevant state and federal interests, to determine whether or not the Interstate Commerce Clause forbids a particular state law as an unconstitutional "burden" on interstate commerce. *See, e.g., Cities Service Gas Co. v. Peerless Oil & Gas Co.*, 340 U.S. 179, 186–87, 71 S.Ct. 215, 219–20, 95 L.Ed. 190 (1950); *Southern Pacific Co. v. Arizona*, 325 U.S. 761, 770–71, 65 S.Ct. 1515, 1521, 89 L.Ed. 1915 (1945); L. Tribe, *American Constitutional Law* § 6–5. Thus, the strong Madison/Marshall "preemptive" view of the Interstate Commerce Clause is no longer the law of the land. *See* L. Tribe, *American Constitutional Law* §§ 6–4 to 6–26.

Similarly, in citing Chief Justice Marshall's strong, preemptive interpretation of the *Indian* Commerce Clause, plaintiffs overstate the force of the Clause under modern Indian law. In *Worcester v. Georgia*, 31 U.S. (6 Pet.) 515, 561, 8 L.Ed. 483 (1832), for example, the Chief Justice wrote that "[t]he whole intercourse between the United States and this [Cherokee] nation, is, by our constitution and laws, vested in the government of the United States." *See also Cherokee Nation v. Georgia*, 30 U.S. (5 Pet.) 1, 19, 8 L.Ed. 25 (1831) (Marshall, C.J.). Nevertheless, despite similar dicta in some later cases, *see, e.g., Oneida Indian Nation v. County of Oneida*, 414 U.S. 661, 670, 94 S.Ct. 772, 778, 39 L.Ed.2d 73 (1974), Supreme Court decisions since Chief Justice Marshall's time have generally rejected the concept that the Clause automatically and necessarily preempts all state laws dealing with Indians. Instead, these decisions have tended to expand the area in which states may legislate. *See, e.g., Rice v. Rehner*, —— U.S. ——, —— – ——, 103 S.Ct. 3291, 3298–01, 77 L.Ed.2d 961 (1983); *Moe v. Confederated Salish & Kootenai Tribes of the Flathead Reservation*, 425 U.S. 463, 481 n. 17, 96 S.Ct. 1634, 1645 n. 17, 48 L.Ed.2d 96 (1976); *Organized Village of Kake v. Egan*, 369 U.S. 60, 74–76, 82 S.Ct. 562, 570–571, 7 L.Ed.2d 573 (1962); *United States v. McGowan*, 302 U.S. 535, 539, 58 S.Ct. 286, 288, 82 L.Ed. 410 (1938); *New York v. Dibble*, 62 U.S. (21 How.) 366, 370, 16 L.Ed. 149 (1858). And, when the Supreme Court has found state legislation preempted, it

has used an analysis that balances the interests of the federal, state, and tribal authorities, rather than any rule that automatically preempts state statutes on the basis of the Clause. *See, e.g., New Mexico v. Mescalero Apache Tribe,* —— U.S. ——, ——, 103 S.Ct. 2378, 2384, 76 L.Ed.2d 611 (1983); *Ramah Navajo School Board, Inc. v. Bureau of Revenue,* 458 U.S. 832, 837, 102 S.Ct. 3394, 3398, 73 L.Ed.2d 1174 (1982); *White Mountain Apache Tribe v. Bracker,* 448 U.S. 136, 145, 100 S.Ct. 2578, 2584, 65 L.Ed.2d 665 (1980); *McClanahan v. Arizona State Tax Commission,* 411 U.S. 164, 172, 93 S.Ct. 1257, 1262, 36 L.Ed.2d 129 (1973). This shift in the method of analysis is fatal to plaintiffs' case for one simple reason: plaintiffs' only hope of success rests upon a strict, absolutist view of Indian Commerce Clause preemption. Any "interest balancing" approach—in view of the enactment of the INA—leads to the conclusion that the Indian Commerce Clause does not preempt the application of the relevant Massachusetts laws to this case.

To see why this is so, first imagine the circumstances in which plaintiffs' preemption argument would be strongest—namely, if Congress had never enacted the INA. Even under those circumstances, one could make a strong argument for the validity of the state statutes—an argument based upon the special, bifurcated nature of Indian land title. That argument would run as follows:

As the Supreme Court noted in *Oneida Indian Nation v. County of Oneida,* 414 U.S. at 667, 94 S.Ct. at 777, American courts recognize two distinct levels of ownership in Indian lands: fee title and Indian title. The common-law fee title passed to the European sovereign at discovery, and it could be transferred by him to his grantees. The fee title in lands that the British king retained passed to the individual states at the time of the revolution. These states, in turn, ceded to the central government their claims to the western territories beyond their present boundaries. Title to Indian lands within their borders, however, was retained by the thirteen original states. (To the extent that our comment in *Epps v.*

*Andrus,* 611 F.2d at 916 suggests the contrary, it is withdrawn.) *See Oneida Indian Nation v. County of Oneida,* 414 U.S. at 670, 94 S.Ct. at 778; *Seneca Nation v. Christy,* 162 U.S. 283, 16 S.Ct. 828, 40 L.Ed. 970 (1896); *United States v. Franklin County,* 50 F.Supp. 152, 156 (N.D.N.Y.1943); Clinton & Hotopp, *Judicial Enforcement of the Federal Restraints on Alienation of Indian Land: The Origins of the Eastern Land Claims,* 31 Me.L.Rev. 17, 36 & n. 73 (1979); Dwyer, *Land Claims Under the Indian Nonintercourse Act, 25 U.S.C. § 177,* 7 B.C.Env. Aff.L.Rev. 259, 265 n. 41 (1978); *cf.* M. Jensen, *The Articles of Confederation* 198–238 (1966) (historical background to land cessions).

Indian title, which gave Indians a "right of occupancy," coexisted with the fee title. This "right of occupancy" was legally significant in several ways. For one thing, only the sovereign (the king, the state, the federal government) could destroy this right; and, as long as the Indians retained it, ownership of the fee title brought with it no present right of possession. Rather, the fee owner "received a contingent future interest which ripened into a fee simple" only when the Indians abandoned their possessory interest (or when the sovereign, holding fee title, took that *possessory* interest). F. Cohen, *Handbook of Federal Indian Law* 321 n. 372 (1942). For another thing, the courts did not otherwise recognize transactions involving this "right of occupancy." Because the owner of fee title held the "exclusive right to extinguish" the "right of occupancy", *Johnson v. McIntosh,* 21 U.S. (8 Wheat.) 543, 585, 5 L.Ed. 681 (1823), efforts by Indians to convey their possessory rights were not recognized by American courts. Instead, one who purchased such rights from the Indians "incorporate[d] himself with them;" if the Indians chose to take their rights back, as far as the U.S. courts were concerned, that was up to them. *Id.* at 593. All these, and related rules, were explained by Chief Justice Marshall in *Johnson v. McIntosh,* and were reaffirmed in subsequent cases. *See, e.g., Oneida Indian Nation v. County of Oneida,* 414

U.S. at 667–74, 94 S.Ct. at 777–80; *Tee-Hit-Ton Indians v. United States,* 348 U.S. 272, 279–81, 75 S.Ct. 313, 317–18, 99 L.Ed. 314 (1955); *United States v. Santa Fe Pacific Railroad Co.,* 314 U.S. 339, 345–46, 62 S.Ct. 248, 251, 86 L.Ed. 260 (1941); *United States v. Shoshone Tribe of Indians,* 304 U.S. 111, 115–16, 58 S.Ct. 794, 797–98, 82 L.Ed. 1213 (1938); *Cramer v. United States,* 261 U.S. 219, 229–30, 43 S.Ct. 342, 344–45, 67 L.Ed. 622 (1923); *Buttz v. Northern Pacific Railroad,* 119 U.S. 55, 66–67, 7 S.Ct. 100, 104–105, 30 L.Ed. 330 (1886); *Beecher v. Wetherby,* 95 U.S. 517, 525, 24 L.Ed. 440 (1877); *Mitchel v. United States,* 34 U.S. (9 Pet.) 711, 9 L.Ed. 283 (1835) (Marshall, C.J.); *Worcester v. Georgia,* 31 U.S. (6 Pet.) 515, 8 L.Ed. 483 (1832) (Marshall, C.J.); *Cherokee Nation v. Georgia,* 30 U.S. (5 Pet.) 1, 8 L.Ed. 25 (1831) (Marshall, C.J.); *Jackson v. Porter,* 13 F.Cas. 235, 240 (N.D.N.Y.Cir.Ct.1825) (No. 7,143).

Against this background, one might argue that the Massachusetts statutes giving Indians fee title and the power to alienate land, were not efforts to *take* land rights *from* the Indians, but rather efforts to *convey* the state's fee title *to* them and thereby to grant them their lands in fee simple absolute. These statutes may have been Massachusetts' own attempt to undo its earlier cases and statutes limiting the rights of Indians in their aboriginal lands to possessory title and invalidating conveyances of that title. *See* 1701 Mass.Prov.Laws ch. 11; *The Book of the General Lavves and Libertyes Concerning the Inhabitants of the Massachusets [1660],* at 161 (statute enacted 1633), *reprinted in The Colonial Laws of Massachusetts* (1889 ed.); *City of Lynn v. Inhabitants of Nahant,* 113 Mass. 433, 449 (1873); *Commonwealth v. City of Roxbury,* 75 Mass. (9 Gray) 451, 478–79 (1857); *Brown v. Inhabitants of Wenham,* 51 Mass. (10 Met.) 495, 498 (1845); *Clark v. Williams,* 36 Mass. (19 Pick.) 499, 500–01 (1837). Thus, these statutes might be seen as part of an effort to remove the legal disabilities of the Indians and grant them full citizenship—as part of an effort that included the passage of an 1869 statutory provision granting Indians "all the rights, privileges and immunities" of state citizens, 1869 Mass. Acts ch. 463, § 1, and the ratification by Massachusetts of the Fourteenth Amendment in 1867.

We need not decide whether this explanation of the Massachusetts statutes would have been sufficient to render them constitutional, despite the Indian Commerce Clause, in a hypothetical world without the INA. One could still have attacked them as unconstitutional by arguing that, regardless of the motives of the Massachusetts legislature, the statutes allowed the Indians to convey title to their lands; that the Indian Commerce Clause was designed to place in the hands of the federal government the decision of whether to allow conveyances by Indians; and that the Clause therefore "froze" the land rights of the various Indian tribes until either they voluntarily abandoned their lands or Congress voted to permit a conveyance. One could note, as well, that the question of "when the Indians are prepared to exercise the privileges and bear the burdens of one *sui juris*" is a matter that "rests with Congress." *United States v. Nice,* 241 U.S. 591, 598, 36 S.Ct. 696, 698, 60 L.Ed. 1192 (1916). On the other hand, one could have argued, in support of the statutes, that Massachusetts was entitled under its general police powers to provide a fair, expeditious, and judicially recognized mechanism for a tribe to convey its possessory rights to its own members if it chose to do so, and that Massachusetts was entitled as fee owner to transfer its title to such members of the tribe. One might add that Massachusetts' primary objective was apparently to help integrate into the non-Indian community those individual Indians who wished to do so, and that it did this without interfering with the area of primary federal concern—the "commerce" between the "settlers" and the semi-autonomous tribes. We do not pretend to know who would have won this hypothetical argument. We wish only to point out that—even without the INA—the Massachusetts statutes are not *clearly* unconstitutional; rather, the outcome of the argument is uncertain. *See generally* Tribe, *Silence, supra,* (exploring

difficulties of interpreting congressional failure to legislate).

Next consider how the relevant features of the constitutional argument change once one takes account of the fact that Congress passed and modified the INA, 1 Stat. 137 (1790); 4 Stat. 729 (1834), to allow Indian tribes to invalidate transfers of (fee or Indian) title to their lands, if the transfers were made without the specific approval of the federal government. For one thing, the constitutional question itself changes. The INA clearly preempts state statutes that conflict with its terms. But, the relevant question now is whether the Indian Commerce Clause preempts state statutes *outside* the INA's scope. For another thing, the INA reflects a congressional judgment about the weight of the relevant federal, state, and tribal interests—interests that the Supreme Court has instructed us to balance to determine whether the Indian Commerce Clause preempts a particular state enactment. *See Rice v. Rehner,* —— U.S. at ——–——, 103 S.Ct. at 3294–3301; *New Mexico v. Mescalero Apache Tribe,* —— U.S. at ——–——, 103 S.Ct. at 2384–86; *Ramah Navajo School Board, Inc. v. Bureau of Revenue,* 458 U.S. at 837, 102 S.Ct. at 3398; *White Mountain Apache Tribe v. Bracker,* 448 U.S. at 145, 100 S.Ct. at 2584. That congressional judgment helps us conclude that this "balance" tilts decisively in favor of the application of the state laws. First, the terms of the Indian Commerce Clause itself grant the federal government the authority to regulate commerce "with the Indian *tribes.*" Although the federal government may choose to supervise transactions involving individual Indians, *see, e.g., United States v. Nice,* 241 U.S. at 600, 36 S.Ct. at 699, the modified (1834) INA indicates that Congress consciously chose not to do so, but, rather, to limit its supervision under the INA to transactions and lawsuits involving the tribes themselves. These facts suggest that the federal interest in nontribal transactions is comparatively small. *Cf. New Mexico v. Mescalero Apache Tribe,* —— U.S. at ——, 103 S.Ct. at 2386 (to find whether a federal interest exists, examine whether the interest is "reflected in federal law").

Second, where individual Indians are involved, the state has a valid interest in maintaining the stability of land transactions entered into according to its laws, in treating all of its citizens equally, and in providing the same property rights to all of its citizens. These factors support Massachusetts' power to act in the area.

Third, the interest of the tribe itself is smaller *outside the area that the INA protects.* In this case, application of the state statutes against the plaintiffs will conflict with no claim that the tribe itself might assert, and will not "interfere with the Tribe's ability to exercise its sovereign functions." *Ramah Navajo School Board, Inc. v. Bureau of Revenue,* 458 U.S. at 837, 102 S.Ct. at 3398. Given the lack of any substantial federal or tribal interests that significantly support preemption, "the State interests at stake are sufficient to justify the assertion of State authority." *New Mexico v. Mescalero Apache Tribe,* —— U.S. at ——, 103 S.Ct. at 2386.

Finally, even though "congressional intent" is not the "sole touchstone" of preemption analysis, *New Mexico v. Mescalero Apache Tribe,* —— U.S. at ——, 103 S.Ct. at 2386, it does support the enforcement of the state statutes in this case. The original enactment of the INA in 1790 suggests that the first Congress did not believe that the Indian Commerce Clause—in and of itself—prohibited state laws validating Indian land conveyances. Otherwise, why would the INA have been necessary? The views and actions of the first Congress, made up of many of the Constitution's framers, are entitled to considerable weight in cases like this of constitutional interpretation. *See Wisconsin v. Pelican Insurance Co.,* 127 U.S. 265, 297, 8 S.Ct. 1370, 1377, 32 L.Ed. 239 (1888), *quoted with approval in Marsh v. Chambers,* —— U.S. ——, ——, 103 S.Ct. 3330, 3334, 77 L.Ed.2d 1019 (1983). Moreover, Congress' modification of the INA in 1834, limiting its applicability to tribal conveyances, suggests that Congress believed that similar activities beyond the scope of

the INA did not "stand[ ] as an obstacle to the accomplishment," *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941), of its objectives. We should hesitate to find the federal interest in activities outside the scope of the statute "weighty" enough to warrant preemption in the face of such a contrary congressional suggestion. *See id.* at 70, 61 S.Ct. at 406 ("object sought to be attained" by Congress is "important in considering ... whether supreme federal enactments preclude enforcement of the state laws"); *cf. Prudential Insurance Co. v. Benjamin,* 328 U.S. 408, 66 S.Ct. 1142, 90 L.Ed. 1342 (1946) (Congress can limit preemptive scope of Interstate Commerce Clause); *Southern Pacific Co. v. Arizona,* 325 U.S. 761, 769, 65 S.Ct. 1515, 1520, 89 L.Ed. 1915 (1945) (same). *Compare Durousseau v. United States,* 10 U.S. (6 Cranch.) 307, 314, 3 L.Ed. 232 (1810) (statute affirmatively describing jurisdiction will "imply a negative" as to jurisdiction not described) *with Hines v. Davidowitz,* 312 U.S. at 74, 61 S.Ct. at 408 (all state regulation preempted where Congress planned for "one uniform national registration system"). In sum, what we can infer about congressional intent supports the conclusion we reached by "weighing the interests"—that, at least after the enactment of the INA, the Indian Commerce Clause does not invalidate the Massachusetts statutes here in question. Since plaintiffs here cannot assert a claim that falls within the scope of the INA (see Part A *supra*), and since the Indian Commerce Clause does not offer an independent ground for holding these conveyances invalid, the district court's dismissal of their claim was proper.

### C

■ After their claims were denied below, plaintiffs moved to amend their complaint, *inter alia,* to include the Gay Head Tribe as a party plaintiff. The district court denied this motion as untimely. The plaintiffs appeal this ruling as well, but we find no basis for reversal. A motion to amend is normally made before judgment. Sometimes a later effort to amend might be

proper. *See* 6 C. Wright & A. Miller, *Federal Practice and Procedure* § 1489 (1971). But here plaintiffs waited until they lost their case as individuals before moving to include the tribe as plaintiff *and* they offered no reason to explain why they did not move to amend sooner. Accordingly, their motion was properly denied. *Hayes v. New England Millwork Distributors, Inc.,* 602 F.2d 15, 19–21 (1st Cir.1979); *Ondis v. Barrows,* 538 F.2d 904, 909 (1st Cir.1976); *see United States Labor Party v. Oremus,* 619 F.2d 683, 692 (7th Cir.1980); *Jackson v. American Bar Association,* 538 F.2d 829, 833 (9th Cir.1976); *Landon v. Northern Natural Gas Co.,* 338 F.2d 17, 20 (10th Cir.1964), *cert. denied,* 381 U.S. 914, 85 S.Ct. 1529, 14 L.Ed.2d 435 (1965).

We have no reason to believe that the plaintiffs' failure to amend earlier was inadvertent. For one thing, their attorney here is the same attorney who handled the appeal in *Epps v. Andrus, supra.* Therefore, he was aware of the need to assert that a plaintiff "is or represents an Indian 'tribe.'" *Id.* at 917. For another thing, as previously mentioned, other Indians have brought a suit on behalf of the Gay Head tribe to obtain land on the peninsula, and they are presently in the process of settling their suit. The plaintiffs here disagreed with the plaintiffs in the other suit, but they evidently did not, or could not, name the tribe as a party plaintiff in this case because the other plaintiffs control the tribe. These facts suggest to us that the pleadings in this case were drawn as part of a litigating strategy and plaintiffs showed the district court no reason why they should not be bound by the consequences of that strategy. In any event, the issue at stake— whether plaintiffs here have a right to upset the settlement entered into by the tribe and its other members—is more appropriately before us in another case appealed to this court, *Wampanoag Tribal Council of Gay Head, Inc. v. Town of Gay Head,* No. 83–1163, scheduled to be heard this September.

Under these circumstances, we find no abuse of the district court's discretionary

power in its denial of plaintiffs' motion to amend the pleadings. To require the district court to permit amendment here would allow plaintiffs to pursue a case to judgment and then, if they lose, to reopen the case by amending their complaint to take account of the court's decision. Such a practice would dramatically undermine the ordinary rules governing the finality of judicial decisions, and should not be sanctioned in the absence of compelling circumstances. *See* 6 C. Wright & A. Miller, *supra,* at § 1489.

Plaintiffs' other claims are without merit, and were properly dismissed.

*Affirmed.*